The case is taken under advisement. The court will proceed to the third case, United States v. Hilliard. Mr. Sachs? Thank you, Your Honor. Good morning, Your Honor. May it please the court, counsel. Joshua Sachs, Your Honor. I'm here today to represent Timothy Hilliard, who is appealing his conviction on multiple counts of heroin distribution and one count of possession of a firearm by a felon, a count which really isn't involved in the issue on this appeal. Mr. Hilliard, as Your Honor would recall, was charged with multiple counts of distributing heroin to a buyer who turned out to be a government agent. Agent Lobno was his actual name. Agent Lobno was holding himself out as the cousin of a man by the name of Henry Romano. Romano was an old friend of Timothy Hilliard, and in fact, they had both clearly been in the drug business at one time. Years before, Hilliard raised a defense of entrapment. He claimed he put that drug business behind him. He was working as a truck driver. He was married. He was trying to turn his life around. Romano, who had been working as a government informant for a long time, unknown to Hilliard, put a lot of effort into trying to get his old friend to get back into the drug business with the intention of being able to turn him in and prosecute him. The case was a little unusual in that Mr. Hilliard actually got to the jury on his entrapment defense. The case was very unusual in that the jury was out for four days trying to make up its mind about the entrapment. In fact, the entrapment was the only contested issue in the case. They were out for four days, and they returned an odd kind of a verdict in which they failed to agree on count one, which was a distribution count, and they found him guilty on all the other counts. Judge Segal made an interesting observation about that. We don't know whether his perception was accurate. First of all, he said he thought this was a case that could have gone either way. A case that what? A case that could have gone either way. He said the government could have lost this case. The defendant could have won this case. Well, he sort of focused on the first acquittal. I don't know. He's been around a long time, so he sees a lot of juries over the years. He was noting that he thought, at least, that the jury was hung up on that first issue and took a lot of time to decide it and then acquitted it. That's exactly right, Your Honor. He thought that the jury, in Judge Segal's words, he thought, well, maybe the jury believed that Mr. Hilliard was entrapped the first time. He said, maybe they thought he was entrapped the second time. He said, at some point, they must have been convinced because of the number of entrants that he was no longer entrapped. Well, he got on to where he needed the money and things like that. Something like that. But the point is that a major theme in the defendant's case was, yes, I admit it. I sold heroin to my old friend Henry for old times' sake and because he kept begging me to do it and he was making fun of me for living in my mother's house. He got on me and finally, when times got hard, I stopped fighting him and I went along with it. But, and this was the key, he says, I never sold heroin to anybody else. I didn't go back into the business. I wasn't a dealer. I had a private source. I would rely on that source to help out my old friend Henry. But that was my only connection with the drugs. You went into sort of in that discussion where he went into a sort of a history of what he knew what he was doing back then, you know, about how to avoid, unfortunately, everything he described as what was going on, but about how to stay away from other people that are watching you. You don't sell when they're watching you. He had a whole lot of things that were sort of curious. He knew a lot. He knew a lot. Was it because this is what he's doing, as the government contended, or is this what he remembered from the old days when he conceitedly used to do it? That was a jury question and apparently the judge thought that's what the jury was hung up on. The point is that one thing could have really, could have, and in fact did, pull the rug out from under this defense. If it wasn't true that Hildred was only dealing with Hank Romano, if he was running other drug deals on the side, he was going to have a hard time sustaining that entrapment defense. And his attorney, early on in cross-examining the agent, asked him, he says, well, do you have any evidence of any other drug deals from my client to anyone beside the government? The agent says, I don't. We were unable to know. Was there, there was no video or any surveillance of my client selling heroin to anybody else? True. And the agent says, it's correct. Well, later on in the trial, counsel asked essentially the same question again. And this time, Agent Lobno says, well, I believe we followed him on occasion where we did meet him and we believe he was doing a drug trial. But we weren't able to identify anybody involved. Notice he says, we believe we observed him doing a drug transaction. We weren't able to identify who was involved. He doesn't say we saw something, we didn't know what it was. But he does say, in addition to that statement, that he didn't have any evidence at that time either, right? Well, he said originally that he didn't have any evidence. With regard to the second statement, he said he didn't have any evidence. Well, I don't recall exactly what his words were. He was interpreting some observations that had been made by another agent. Agent Lobno was not present at the time of those observations. Obviously, because he was the undercover agent, they wouldn't have wanted him around anywhere else when he was looking. But there was a surveillance agent, and there was some testimony as to just what the surveillance agent saw. And that was stipulated. The testimony was, well, he went to an address in Skokie, and I saw him sitting in front of the house with his cell phone. I'm going from memory here, your honors. And then a few minutes later, I saw him behind the same house with his cell phone, and then he left the area. And that was it. There was nothing about, I saw somebody approach him, I saw him approach somebody, I saw another car approach his, I saw something change hands. There was nothing to indicate that any kind of a transaction at all took place. But Agent Lobno responded to Defense Counsel's question, well, there was this incident, we believed he was doing a drug transaction, but we couldn't identify the people involved. I've indicated in the brief, he's giving an opinion, what the government, I believe, characterized as ambiguous observations, an opinion on the basis of his experience as an agent that what was actually observed was a drug transaction. It's not rules the government concedes, it's not 702 evidence, he's not a 702 witness, government acknowledges that. It's not 701 testimony, it's not based on his perception. Our reply brief discusses some of the cases the government had cited. This is not the kind of perception by the witness or involvement by the witness himself that would allow the office to testify. He's taking an observation that really doesn't say anything. It can only characterize as a negative observation, and not only is he making a drug deal out of it, but when he says, well, we believe this, the implication is, it's not just me. The surveillance agent and I, or who knows, we had a little talk. He doesn't go so far as to say this, but the implication is, we agents involved in this case, we know what he's up to. Very, very, very improper testimony, Your Honor. Did he say he was not part of the surveillance? I'm sorry? Did he say he was not part of the surveillance? He said... He said we. I mean, is he in the car with the guys? I don't believe so, Your Honor. I think that exactly what he said is elsewhere in the brief, but I think it was right there, right in that context around page 284, 282, somewhere where he said that he wasn't there because he didn't want to be seen. He didn't want Mr. Hilliard to see him because, after all, he's in contact with Mr. Hilliard on a regular basis. He's posing as Hank Romano's cousin who's interested in buying some drugs. Hank is the middleman. Well, surveillance usually means you're not exposed, but I don't know what... Well, it means that Lobno doesn't want Hilliard to see him, so it seemed clear that Lobno was not present. There was another surveillance agent who made these observations, which were so inconsequential, they just came in by stipulation, and Mr. Lobno, he built a castle on it. I don't know how else to put it. Well, but in closing argument, the government made no reference to this testimony, or did they indicate that there was any uncharged drug dealing? The government very wisely let it go, didn't say anything about it. They should have disavowed it. They should have disavowed it. They should have explained it. They didn't do that. Well, they said there was no evidence. I mean, I don't know how else you disavow it. No evidence of any drug deal. Even so, Your Honor, without a formal disavowal, the cat was out of the bag or the genie was out of the bottle. I don't know how else to put it. Well, Mr. Sachs, your concern is that in addition to what Hilliard acknowledges he did by providing these drugs, that there's a suggestion that he was involved in some other drug event. Hilliard's position was, you know, yes, I've been selling to Hank, and yes, I'm selling to Lobno, but I'm doing it for old Hank. But I'm not selling to anybody else. It's a fair implication he had to obtain it. Well, obviously we knew he had to obtain it. I think he had an explanation for that. I think he said he was getting it from his ex-wife or something like that. But the point was he was saying, I'm not that in the business and the government said, yes, you are, yes, you are, we can tell. That's what Lobno said. No, I understand. You're suggesting he's not in the sort of the retail trade of what he did before. But to be a supplier to this case, there had to be an antecedent transaction. There was a source. I mean, he had to know. He wasn't the source. He had to get the thing. Sure. He had to know somebody. He had to know somebody. He's not saying he didn't know people who did drugs. He's saying, but I stayed out of it until Hank begged me to do it. Now, look, the jury could have found him guilty. The jury could have said, yeah, we believe that you're only selling to Hank and to Lobno, but we don't think you're, come on, Tim, we don't think you were in trouble. They could have said that. But what they could not have said is, well, you're selling to Hank, you're selling to Lobno, and all these other people too, come on, this is not even a chance at entrapment. If what the agent said had any impact on the case, it could have just made the difference. Thank you, Your Honor. Thank you, Mr. Faxon. Did I use up all my time? You did, but I'm going to provide you with some rebuttal time. Thank you. Ms. Morrissey-Stack? May it please the Court? Good morning. My name is Megan Stack, and I represent the government in this matter. Agent Lobno's testimony was responsive to questions posed on cross, and therefore the district court did not abuse its discretion in denying the defense motions based on that testimony. The contested testimony arose during a series of questions asking about the possibility that the defendant had other customers besides the government. The defendant wants the court, I think, to focus on a single question and answer, but that unfairly ignores the important context that preceded that exchange, and the words really are important here. Defense counsel began by asking the agent two times about the possibility that other customers existed, and he got unhelpful answers to those questions. Still, counsel pressed on, asking whether the agent knew of any facts or evidence indicating this possibility of other customers. In light of that preceding discussion about this possibility, agent Lobno answered simply, yes, I do. In other words, yes, I do believe there is evidence that the defendant had additional customers. Counsel proceeded to press on, saying, tell me about that. Agent Lobno then cited two pieces of evidence throughout the ensuing exchange. First, the recorded comments that the defendant had made throughout the investigation, and second, this particular surveillance that immediately preceded one of the controlled transactions in this case. This testimony did not contradict agent Lobno's earlier testimony, and again, the words are important here. Agent Lobno specifically said, I believe we followed him on occasion where we believed he was doing a transaction. He was stating an inference, an opinion, if you will, based on the facts he knew in the case. And as your honors pointed out, he immediately conceded some of the limitations of that inference. He immediately said, but we weren't able to identify anybody involved. And later on in the exchange, when pressed by defense counsel, he again conceded, we weren't able to identify anything specific or any people involved. And when counsel specifically asked, did you see him get out of the car and deliver a package to somebody, agent Lobno properly and correctly answered, yes. In light of this record, any error that ensued from this testimony was certainly harmless for two reasons. First, the inference that agent Lobno testified about was reasonable in light of the facts he knew at the time. And second, the government's view is that the entrapment defense was overall weak. The evidence of predisposition in this case was very strong in light of the defendant's recorded comments. And his testimony about inducement was, at best, incredible. If there are no questions, the government respectfully requests that the court affirm defendant's conviction. Thank you. Mr. Sachs, you may have an additional two minutes. Thank you, your honors. My opening argument of the brief, I pretty much covered everything. But I can't finish without saying that if the evidence is so strong and the defense case for entrapment is that weak, why is the jury out for four days? And why are they unable to reach an agreement on the original path? Mr. Sachs, what are we to make of the defense counsel initiated this line of inquiry? Well, I think he did. One thing is that he, I think if you look at the entire course of testimony, he is repeatedly admonishing the agent, I want facts, I don't want your opinion, I don't want your guess, I don't want your speculation. The other is he's doing it in light of the agent's early original sworn denial that there was anything else. I think counsel was, he was entitled to ask that question on the assumption that the officer's sworn testimony was truthful. All right. Thank you. Thank you, Mr. Sachs. Thanks to the government counsel. Mr. Sachs, you have the additional thanks of this court for accepting the appointment. Thank you. Case is taken under advisement.